IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEROME DAVIS, | ) | CASE NO. 4:05CV3238 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LANCASTER COUNTY, NEBRASKA, | ) | MEMORANDUM |
| MARIA BACHMAN, Officer, Lancaster | ) | AND ORDER |
| County Jail, in Individual and Official | ) | |
| Capacities, SCOTT BYKERK, Officer, | ) | |
| Lancaster County Jail, in Individual and | ) | |
| Official Capacities, STEVEN | ) | |
| ENGSTROM, Sgt., Officer, Lancaster | ) | |
| County Jail, in Individual and Official | ) | |
| Capacities, THOMAS MCMILLAN, Sgt., | ) | |
| Officer, Lancaster County Jail, in | ) | |
| Individual and Official Capacities, | ) | |
| MATTHEW VINCENTINI, in his | ) | |
| Individual Capacity, and TERRY | ) | |
| WEBER, Superintendent, Lancaster | ) | |
| County Jail, in Individual and Official | ) | |
| Capacities, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the remaining Defendants' Motion for Summary Judgment (Filing No. 205).[1] The Plaintiff, Jerome Davis, is a state prisoner who was formerly in the custody of the Lancaster County Corrections Department ("LCC") Jail on November 10, 2004, through April 14, 2005. Davis alleges while he was in the custody of the LCC, certain LCC employees and Lancaster County violated his rights secured by the Fifth and Fourteenth Amendments to the Constitution by using excessive force against him and in punishing him by unreasonably restricting his freedom. (*See* Complaint and Amendment at Filing Nos. 1 and 8). Davis asserts his claims pursuant to 42 U.S.C. §

---

[1] Joe Anderson, Michael Thurber and Michael Thew were previously granted summary judgment and have been dismissed from this action. (Filing No. 82). Even though Tami (Wassel) Waddel, Donald Foster, and Michael Siemer appear on the caption as defendants, service of process was not obtained on them, and they will be dismissed without prejudice.

1983, and he seeks compensatory damages. Defendants Lancaster County, Maria Bachman, Scott Bykerk, Steven Engstrom, Thomas McMillan, and Terry Weber argue that they are entitled to summary judgment as a matter of law. Although Defendant Officer Matthew Vincentini did not join in the motion for summary judgment, the reason for which is not known to the Court, but which may have been a clerical oversight given that he is represented by the same counsel as the other remaining Defendants, the Court *sua sponte* will consider all claims against Officer Vincentini in the context of the Defendants' motion.

## Standard of Review

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249–50 (citations omitted). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327.

## FACTUAL BACKGROUND

*November 16, 2004*

Davis's claims arise from two incidents that occurred when he was a pretrial detainee who was being housed in the Lancaster County Jail. The first incident occurred on November 16, 2004, and the second occurred on April 7, 2005. There is no dispute that on November 16, 2004, a fight between LCC Officer Matthew Vincentini and Jerome Davis occurred, and that during the fight the two men exchanged blows. On that date, Davis was in pretrial custody at the Lancaster County Jail, and was housed in A2 pod, cell number 18.[2] Davis stood in an area outside of his cell, and he was wearing a county T-shirt wrapped around his head in violation of the jail's rules as set forth in the Lancaster County Corrections Department Inmate Handbook. All inmates, including Davis, receive

---

[2] Unless other citation is provided, the factual background is substantiated by the facts identified by numbered paragraphs located in the moving party's brief, which are supported by pinpoint references to the record as is required by the Court's local rules. Filing No. 206, Defendants' Brief in Support of the Motion for Summary Judgment, Statement of Facts, at paragraphs 1 to 55. The Defendants' Index of Evidence is at Filing No. 207, and the Affidavit of M. Thurber and several attachments is at Filing Nos. 104 and 212). The Plaintiff's evidence at Filing Nos. 210 and 211 has also been considered.

3

a copy of the Handbook upon their admission to the jail.  At approximately 6:40 p.m., Defendant Matthew Vincentini and Nurse Lori Burns entered A2 pod area.  Officer Vincentini observed Davis wearing the T-shirt on his head, and he either told Davis, or motioned to Davis, to remove the T-shirt from his head.  Davis, who admits that he understood Officer Vincentini's communication, refused to remove the t-shirt. (Davis Dep. 11:18-12:9).  Officer Vicentini met Davis near the entrance of the subday room, and Officer Vincentini ordered Davis to take the shirt off of his head and to lock down.[3]  Davis refused again.  Officer Vincentini ordered Davis to remove the t-shirt from his head a third time and to lock down, and Davis refused.  As Officer Vincentini moved toward Davis, he called for assistance, and then, according to Davis, Officer Vincentini said he would leave Davis alone if he'd just take the t-shirt off his head.  Vincentini denies making that statement.  Davis removed the t-shirt.

According to Officer Vincentini, Davis eventually became belligerent and directed profanity toward Vincentini.  Davis concedes that he was using profanity, and he agrees that he had warned Officer Vincentini not to touch him, and that he threatened Officer Vincentini with physical harm if Officer Vincentini touched him.  (Davis Dep. 17:11-18:6; 23:6 - 24:5).  For the third time, Officer Vincentini order Davis to lock down, and Davis refused.  They were near Davis's cell, and Officer Vincentini used both hands to push Davis into his cell.  Officer Vincentini has stated that he felt threatened by Davis during this time when other correctional officers had not yet arrived to offer assistance.

---

[3] "Lock down" means to go to your cell and shut your door.  Davis knew what was meant by the order. (Davis Dep. 18:7–13).

After he pushed Davis into his cell, Officer Vincentini slammed the cell door, but it did not latch. Davis came out of his cell and went after Officer Vincentini, and a fight began between them. (Davis Dep. 26: 12-16). Both men sustained minor injuries as a result of the fight: Davis had a split lip; Officer Vincentini had contusions, bruising and a loosened tooth. (Vincentini Dep. 8:1-4.) At some point, Davis grabbed a phone receiver and wielded it toward Vincentini, though Davis did not strike anyone with it. Within minutes after the fight began, additional corrections officers arrived and restrained Davis.

Defendants Maria Bachman, Scott Bykerk, Steven Engstrom, and Thomas McMillan were involved in restraining Davis and/or taking him to the holding cell and placing him in a restraint chair. In his amended complaint, Davis alleges that he was punched, kicked, and tasered on November 16, 2004. In the investigative report completed by Officer Vincentini, he admits that he initially pushed Davis to get him into his cell, and that he punched and kicked Davis while they were fighting. (Filing No. 62, Vincentini Aff. Ex. A.) In his deposition, Davis stated that a taser was not used on him on Davis on November 16, 2004, and that after the fighting with Officer Vincentini stopped, he was not punched or kicked by anyone and did not struggle against the officers. (Filing No. 207, Davis Dep. 31:1-15; 34:10-11).

After he was restrained, Davis was taken to holding cell no. 11 in the booking area of the jail. Once in the holding cell, Davis was placed in a restraint chair at approximately 7:13 p.m., on November 16, 2004, and he remained in the restraint chair for a period of time. (Filing No. 104, S.Engstrom Aff. Ex. B). Defendants Engstrom, McMillan, and Bachman, assisted in getting Davis into the chair. (Id.) Nurse Burns assessed Davis for serious injuries around 8:15 p.m.; she determined that he "was fine" after what Davis felt

was a cursory review of his condition. (*Id.*; and Davis Dep. 45:8-12). Davis told her that he had not been seriously injured. (*Id.*) According to the observation log that was maintained while Davis was in the holding cell, he was later given some over-the-counter pain relief medicine.

In his deposition, Davis stated that he asked to use a restroom before he was restrained in the chair, and his request was denied. Davis stated that he did not ask to use a restroom during the time he was restrained in the chair, though he urinated about an hour after he was initially restrained in the chair. (Davis Dep. 46:24 - 47:13). After Davis was released from the restraint chair, he was given clean clothes to wear while he was in holding cell no. 11. Holding cell no. 11 has a toilet built into the floor of the cell. Davis was provided toilet paper and used the toilet while he was in holding cell no. 11. Davis was fed breakfast during the time he was in holding cell no. 11. He remained in that holding cell for approximately 24 hours, and then he was moved to another cell.

Davis filed three grievances related to these events. The first grievance, dated November 30, 2004, was specifically limited to the November 16, 2004, physical altercation with Officer Vincentini. That grievance does not mention the use of the emergency restraint chair. Davis filed a grievance on December 2, 2004, in which he states that he requested to speak with a jail counselor after he was removed from the restraint chair, and he describes how his request for a counselor was handled. The grievance states that Davis had been strapped in the chair, and that is presumably one of the subjects he wished to discuss with the counselor. Davis filed a third grievance on December 3, 2004, regarding the events of November 17, 2004, in which Davis described the conditions what he considered the unsanitary in holding cell no. 11.

***April 7, 2005 Memorandum***

The second incident described in the Amended Complaint occurred on April 7, 2005, when Superintendent Weber issued a memorandum imposing non-disciplinary restrictions upon Davis. Approximately a month before the memorandum was issued, on March 3, 2005, Davis was arraigned on his pending charges in Lancaster County District Court. He entered a plea of no contest to charges of felony theft and fleeing to avoid arrest. Davis was sentenced on April 14, 2005, and his custody was transferred from the Lancaster County Jail to the Nebraska Department of Corrections.

On April 6, 2005, after entering his plea but before sentencing, Davis was an inmate classified to Special Management Housing at the Lancaster County Jail. (Filing No. 207, Weber Aff. ¶7). He continued to be bound to obey a direct order of a correctional officer pursuant to the Inmate Handbook. (Filing No. 62, Weber Aff. ¶3). On April 6, 2005, Davis refused an order given by two corrections officers to lock down in his cell. Davis also threatened to cause problems for the LCC staff between that day and the date he was scheduled to be transferred from the LCC Jail, April 14, 2005. On April 7, 2005, Jail Superintendent Terry Weber imposed non-disciplinary restrictions upon Davis. His decision to impose the non-disciplinary restrictions was based on Davis's threat to cause disruptions during the week preceding April 14, 2005, his past behavior,[4] his disciplinary history,[5] and the operational needs of the facility. (Weber Aff. ¶¶ 4-8).

---

[4] Davis stated that he had been "combative" with corrections officers in the past, that they had "history," and that there were times when he spit on officers or threw things on them, such as coffee. (David Dep. 36:1-15).

[5] Davis admitted that approximately 50 misconduct reports were prepared regarding his misconduct during his time at the Lancaster County Jail. (Davis Dep. 46:23 - 47:13).

A copy of the memorandum outlining the restrictions was provided to Davis. As a result of the restrictions, Davis's privileges from April 7 through his departure on April 14, 2005, were few. For example, Davis was allowed access to the courts through letters and his legal counsel (he was represented by counsel from December 13, 2004, through April 14, 2005), and phone privileges were available assuming his good behavior and given advance notice. Visitation was permitted only with his attorney. (*Id.*, Filing No. 73, Weber Aff. Ex. J).

## Analysis

To state a claim under 42 U. S. C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). Liberally construing Davis's Amended Complaint (Filing Nos 1 and 8), he alleges that on November 16, 2004, while he was being held as a pretrial detainee, the Defendants (except Weber) violated his constitutional rights by to be free from the use of excessive force to restrain him, including forcing him to the floor, punching him, kicking him, and using a taser, and by unreasonably depriving him of his freedom by placing him in the restraint chair.

Because pretrial detainees are presumed innocent, they retain their constitutional right to be free from punishment even though they are confined. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 535, 558-59 (1979). Thus, a pretrial detainee's claim regarding conditions or restrictions of confinement are analyzed under the Fifth and Fourteenth Amendments rather than the Eighth Amendment. *See Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005). In determining whether particular "restrictions and conditions accompanying pretrial

detention amount to punishment in the constitutional sense of that word, . . . [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell,* 441 U.S. at 538. If there is no expressed intent to punish the pretrial detainee, then the court's determination will turn on whether the restriction is rationally related to another legitimate purpose, and whether the restriction appears "excessive in relation to the alternative purpose assigned [to it]." *Id.* at 539 (*quoting Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)).

In this case, there is no evidence of an expressed intent to punish Davis. Rather, the Defendants argue that their actions were taken to secure order in the facility and maintain security. The United States Supreme Court has recognized that, "Ensuring security and order at [an] institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both." *Id.* at 561. Thus, the Court finds that the Defendants' stated purpose is legitimate, and the Defendants' actions were reasonably related to furthering that legitimate purpose.

The Court finds that the LCC employees' actions were justified because they were required to restore order and to maintain security at the jail. The fight between Davis and Officer Vincentini occurred only after Davis refused three times to take the t-shirt from his head and only after Davis refused three orders to lock down. Davis does not dispute this. Following Davis's third refusal to lock down (albeit after Davis removed the t-shirt from his head), Officer Vincentini, using his open palms, pushed Davis into his cell and closed the door. The cell door did not latch, and Davis admits that he went after Officer Vincentini. Davis threw several punches to Officer Vincentini face and head, and Officer Vincentini fought back by throwing punches and kicking Davis in the chest. The fight attracted a large

crowd of inmates, who refused several direct orders to lock down given by Officer Scott Hutsell and Officer Opp. (Filing No. 207, Bykerk Aff. ¶3; Hutsell Aff. ¶ 3). Eventually, the inmates returned to their cells for lock down. The Court finds that there are no genuine issues of material fact that remain for determination, and that officers' actions were rationally related to and actually further the goal of achieving order and maintaining security at the jail.

Separate from the struggle between Officer Vincentini and Davis, and the attempts to restrain him, Davis contends that the Defendants violated his constitutional rights when they placed him in the restraint chair. Davis contends that the Defendants placed him in the chair for the sole reason of punishing him for his attack on a corrections officer. He testified that he did not resist the officers at any time after the struggle with Officer Vincentini ended. In this context, the Court must consider whether the restriction, that is the placement of Davis in the restraint chair for a period of between two and three hours, is rationally related to a legitimate purpose other than punishment. If it is, then the Court must consider whether the restriction appears "excessive in relation to the alternative purpose assigned [to it]."

Defendants argue stated that the interests in maintaining order and security at the jail were furthered by withdrawing Davis from the A2 pod and placing him in the restraint chair immediately upon his arrival at the holding cell. I agree, and I find there is no genuine issue of material fact regarding that conclusion. Davis's fight with a corrections officer caused a large crowd of inmates to gather around him. His physical extraction from that area undeniably assisted in returning calm to the A2 pod.

The next part of the inquiry is whether his placement in the chair for up to three hours was excessive in relation to the jail's interest in order and maintaining security. Under all the circumstances presented here, I conclude that it was not excessive. Davis had just attacked a corrections officer. Had he been able to control himself, and stay in his cell, the fight would not have occurred, the entire pod would not have been disrupted, and corrections officers would not have been called from other parts of the facility to assist Officer Vincentini. A period of cooling off was appropriate. Davis stayed in the chair from approximately 7:13 p.m. until the shift change at 10:00 p.m., (*see* Davis Dep. at 43), or if the jail's behavior observation log is accurate, then he remained in the chair only until 9:17 p.m.[6] Having considered all the evidence, I find that there are no genuine issues of material fact about the Defendants' use of the restraint chair for Davis on November 16, and that the Defendants did not violate Davis's constitutional rights. In the hour before he was placed in the chair, Davis had refused several direct orders, had attacked a corrections officer, and he had caused a serious disturbance during which other inmates refused direct orders to lock down. Isolating and subduing a pretrial detainee who has caused a major disturbance undeniably furthers the legitimate interest in maintaining security and order in the jail. Keeping Davis in the chair for two to three hours during which time he was frequently monitored as reflected in the observation log, and given the negative medical assessment, does not rise to the level of a constitutional violation.[7] The Court finds that

---

[6] According to Defendant Bachman, Davis was released from the chair between 9:08 and 9:28 p.m. (Filing No. 104, Bachman Aff. ¶5).

[7] I note that this Court has upheld the Lancaster County Correction Department's use of a restraint chair on a pretrial detainee under similar circumstances for an even longer period of time. *See also Birdine v. Gray*, 375 F.Supp.2d 874, 880 - 81 (D.Neb. 2005). Facts relied on by the

11

there are no genuine issues of material fact remaining, that the LCC employee's appropriate use of the restraint chair on Davis did not violate his constitutional rights, and that the Defendants are entitled to summary judgment on this part of Davis's claim.

The final portion of the claim related to November 16 and 17, 2004, is Davis's claim that the conditions of his confinement in holding cell no. 11 were unconstitutional, based primarily upon the failure of the Defendants to provide him with a blanket and the cell's lack of running water. The lack of running water made it impossible for Davis to wash his body, including his hands before he ate, and it required him to use a toilet in the floor rather than a toilet that flushed with water. Davis was given clean clothes to change into after he was released from the chair, but no blanket. As a matter of law, Davis's exposure to these conditions for a 24-hour period does not deprive him of any constitutional rights. See *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (no Eighth Amendment or Due Process Clause violation when plaintiff, a pretrial detainee, was subjected to raw sewage for four days); *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 83-84 (8th Cir. 1996) (several days without underwear, blankets, mattress, exercise and visits not in violation of Eighth Amendment); *Williams v. Delo*, 49 F.3d 442, 444 (8th Cir. 1995) (four days without clothes, mattress, water, bedding, mail, and hygienic supplies not in violation of Eighth Amendment); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (eleven days in an unsanitary

---

Court included that Birdine was placed in the restraint chair as a last resort and only after physically resisting the officers on two occasions; (2) Birdine was constantly monitored while in the restraint chair; (3) a log of the monitoring was maintained; (4) he was observed by a nurse while in the chair; (5) appropriate calls to superior officers were made when the use of the chair exceeded four hours.

cell did not amount to an Eighth Amendment violation because of the short period of exposure).[8]

Based on this undisputed evidence, I conclude that the Defendants did not violate Davis's constitutional right to due process or to be free from unreasonable restrictions on his freedom, in any of the particulars, when:  1) Officer Vincentini attempted to defend himself and regain control of Davis; 2)  the Defendants intervened to stop the brawl; 3) Davis was contained, transported to a holding cell, and placed in the restraint chair;  4) Davis was confined to the restraint chair up to three hours; and 5) he was required to stay for 24 hours in holding cell no. 11.   The Court concludes that there is no genuine issue of material fact presented, that there are no facts to show that the Defendants violated Davis's constitutional rights in connection to their actions taken on November 16, 2004.  The Defendants are entitled to summary judgment on this claim as a matter of law.

**April 6-14, 2004**

The second part of Davis's Amended Complaint alleges that the Defendant Terry Weber, as LCC jail superintendent, violated his due process rights when he issued a memorandum on April 7, 2005, imposing "non-disciplinary restrictions" upon him.  The restrictions outlined in Weber's memorandum applied from April 7 to April 14, 2005, the day his custody was transferred from Lancaster County.  Because Davis had not been

---

[8] While these cases apply the Eighth Amendment language, the standard under the Fourteenth Amendment and the Eighth Amendment is the same: "deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety." *Butler v. Fletcher,* 465 F. 3d 340, 345 (8th Cir. 2006).

13

sentenced when the restrictions were imposed on him, Davis's status is that of a pretrial detainee, and the *Bell v. Wolfish* analysis applies.

The restrictions outlined in Superintendent Weber's memorandum are expressly identified as "non-disciplinary." Thus, the court must consider whether the restrictions are rationally related to another legitimate purpose, and whether the restriction appears excessive in relation to the alternative purpose assigned to it. *Bell*, 441 U.S. at 539 quotation omitted. The day before the restrictions were placed on him, Davis refused a direct order to lock down, and he also threatened to cause problems for the jail staff during the week before he was transferred. Superintendent Weber issued the memorandum setting forth the non-disciplinary restrictions that were to be imposed on Davis during his final week. Weber has stated that the memorandum was issued based on Davis's threats, past behavior, disciplinary history, and the operational needs of the facility. *See* notes 4 and 5 above. The purpose of the restrictions was not punishment, but rather control of Davis in the week before his transfer. I find that the restrictions outlined in the April 7, 2005, Memorandum were not excessive given the stated purpose of furthering the operational needs of the facility.

Davis seems to object most strenuously to the restriction upon his access to the law library. For the week that he was restricted from the LCC law library, he was not restricted from corresponding with his attorney or visitation with his attorney. Thus, the Court finds this restriction did not rise to a constitutional violation. "Prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional right to the courts. " *Lewis v. Casey*, 518 U.S. 343, 351 (1996). By allowing

Davis access to his lawyer, Superintendent Weber adequately protected Davis's constitutional right to access to the courts for that week-long period.

The non-disciplinary restrictions were imposed to maintain security and further the operational needs of the jail, including predictability and efficiency, particularly during a week when Davis had threatened to be disruptive. The Court finds there are no facts to support Davis's claim that his constitutional rights were violated as a result of the restrictions. Accordingly, the Court concludes that the Defendants are entitled to summary judgment on the claims relating to the April 7, 2005, Memorandum and the imposition of non-disciplinary restrictions upon him.

**County Liability**

Davis has sued Lancaster County, itself. To establish municipal liability under Section 1983, a plaintiff must show that his constitutional rights were violated by an action taken pursuant to official municipal policy or misconduct so pervasive among non policy making employees of the municipality that it constitutes a custom or usage with the force of law. *Ware v. Jackson County, Missouri*, 150 F3d 873 (8th Cir. 1988); *Monell v. Dept. Of Social Servs.*, 436 U.S. 658, 691 (1978). The Court finds that the amended complaint does not call into question any policy, custom or practice of the County that deprived Davis of a constitutional right. There is no evidence that the County has a policy that permits its employees to misuse the restraint chair, nor is there evidence that by practice or custom the County has condoned the chair's misuse. The County's policy regarding the use of the restraint chair and the County's policy regarding the imposition of non disciplinary restrictions just prior to an inmate leaving the facility are constitutional. Furthermore, Plaintiff has failed to present any facts that show there is a policy, practice or custom in

Lancaster County that resulted in a deprivation of constitutional rights to Jerome Davis. The County is entitled to summary judgment as a matter of law.

## Conclusion

The Court has given Davis ample time and opportunity to develop a claim, and he has been unable to come forward with facts to show that there are any genuine issues of material fact that remain to be decided. Davis has completely failed to establish his claims, and the Court concludes that all the Defendants are entitled to summary judgment as a matter of law.

IT IS ORDERED:

1. The Defendants' Motion for Summary Judgment (Filing No. 205) is granted in all respects;

2. The Complaint, Amended Complaint, and all claims in this action that have been asserted by the Plaintiff Jerome Davis against the Defendants, including Defendant Matthew Vincentini, are dismissed with prejudice; and

3. A separate judgment will be filed.

DATED this 17th day of September, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge